GULOTTA, Judge.
In this intersectional accident case, defendant-driver, Dennis E. Lockette, and his insurer appeal from a $75,000.00 lump sum jury verdict in favor of plaintiff-driver, Mary Gonzalez, for damages sustained in the accident. Both liability and quantum are in issue. We affirm.
The collision occurred on August 16,1977, at the intersection of S. Galvez Street and Tulane Avenue in the city of New Orleans. Tulane Avenue is a six-lane neutral ground thoroughfare with three traffic lanes heading toward the river and three lanes heading toward the lake. S. Galvez is a four-lane avenue with a neutral ground separating two lanes of traffic. The intersection is controlled by traffic lights.
Citing inconsistencies in the testimony, defendants contend the jury erred in awarding a judgment in favor of plaintiff. Defendants further argue that the jury erred in finding causation between plaintiff’s ruptured L5/L6 disc and the automobile accident. According to defendant, a subsequent, unrelated hospital accident in July, 1978 caused Mary Gonzalez’s ruptured disc, if indeed she suffered from a disc problem.
In answer to the appeal, plaintiff seeks an increase in the $75,000.00 award.
LIABILITY
On August 16,1977, at approximately 12:30 p. m., the defendant vehicle driven by Dennis Lockette was traveling in the center lane on Tulane Ave. toward the central business district. The Gonzalez vehicle *266 driven by plaintiff was traveling in the right lane of S. Galvez St. toward Poydras and approached the intersection of Tulane and Galvez from defendant’s left. Both cars were traveling approximately 25 mph at the time of collision. The crucial question for the jury was the determination of who was favored with the green light at the time of the accident. Each driver claimed the other had entered the intersection on a red light.
Lockette testified that he was favored with a green light when he entered the Galvez intersection. He noticed plaintiff’s vehicle coming from his left just before reaching the intersection and slammed on his brakes but was unable to avoid the collision. According to Lockette, there were no cars ahead or behind him and there was nothing to obscure his vision of the traffic lights. The front of his vehicle struck the passenger side of plaintiff’s car. His version of the accident was corroborated by his wife’s testimony.
Another witness corroborating the Lock-ettes’ version of the accident was Perry McGee. He testified that while riding as a passenger in a truck traveling on Galvez in a direction opposite to plaintiff’s vehicle, he was stopped at a red light on Galvez on the Poydras side of Tulane Ave. and saw plaintiff’s vehicle enter the intersection on a red light and collide with defendant’s vehicle, favored with a green light on Tulane.
Mary Gonzalez testified, on the other hand, that as she approached the intersection of S. Galvez and Banks Streets, a short block before Tulane Ave., the traffic lights at the corners of Tulane and Galvez and Banks and Galvez, were red for Galvez traffic. She slowed for the light at Galvez and Banks but had not brought her car to a stop when the light at Tulane and the one at Banks both turned green in her favor. As she entered the intersection at Tulane and Galvez, while favored with the green light, Gonzalez noticed cars on Tulane Ave. lake-bound and a car riverbound stopped in obedience to the red light for Tulane. She did not see defendant’s car until it was “right up on her”, and she was unable to accelerate or brake to avoid the collision. Ronald Peters, a passenger in the Gonzalez vehicle, corroborated plaintiff’s version of the accident.
Another witness, Alvin Kennedy, who observed the collision from a store window on the corner of Tulane and Galvez, stated that the traffic light at Tulane had turned orange as the defendant vehicle approached the intersection and that the Lockette vehicle “speeded up and tried to make the caution light.” Kennedy testified that when Lockette entered the intersection the light was red for him and that he “ran” the red light. According to Kennedy, plaintiff’s vehicle did not enter the intersection prematurely.
Joseph Hughes, a cab driver, testified that while headed on Tulane in the direction opposite to defendants’ vehicle, he stopped for a red light at Galvez and Tulane. While stopped at the light and talking to a passenger, Hughes heard the crash. He testified that the light was red in his direction both before and after the impact.
Similarly, Lionel McGee testified that he was a passenger in a truck traveling on Galvez toward Canal St. in a direction opposite to plaintiff. After crossing Tulane and Banks Streets on lights green for Galvez traffic, he heard the crash. Though he did not see defendant’s car, he had noticed plaintiff’s vehicle stopped for a light at the intersection of Galvez and Banks before the accident. He also stated that as he crossed Tulane, the traffic on Tulane to his right heading lakebound opposite to defendants’ vehicle was stopped.
This testimony and evidence considered, we cannot say the jury’s finding of defendants’ liability was manifestly erroneous or clearly wrong. See Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Plaintiff’s testimony that she was favored with a green light as she crossed the intersection finds support in the testimony of her passenger and three other disinterested witnesses, Kennedy, Hughes and Lionel McGee. This testimony provides a substantial factual basis for finding defendant neg *267 ligent and plaintiff not contributorily negligent. Although, as pointed out by defendants, certain inconsistencies[1] existed in the testimony of plaintiffs witnesses, these discrepancies were apparently not of such significance in the jury’s mind to defeat plaintiff’s version of the accident. When we consider the inconsistencies, we cannot say that the jury erred in finding liability or that its verdict was not supported by “credible” evidence. Harrison v. Howell, 384 So.2d 464 (La.App. 4th Cir. 1980).
CAUSATION
Following the accident on August 16, 1977, plaintiff had complaints of neck, back and leg pain. After hospitalization on six occasions and diagnosis and treatment by four physicians, on September 13, 1978 Gonzalez underwent a lumbar laminectomy with the removal of a herniated L5/L6 disc.
It is defendants’ contention that the ruptured disc was caused by a hospital fall on July 7,1978, and not by the August 16,1977 automobile accident. According to defendants, the automobile accident caused nothing more than an aggravation of plaintiff’s pre-existing lumbar strain from an industrial accident predating the automobile accident from which plaintiff recovered by February, 1978. Accordingly, defendant argues that any award due plaintiff should be based, at most, on a six-month recovery period from August, 1977 until February, 1978. We disagree.
On June 9, 1977, before the automobile accident, plaintiff fell at work and was taken to Ochsner Hospital, treated and sent home to rest for a few days. Subsequently she was terminated by her employer, Union Carbide, for the reason that she was physically unable to do her job as a production technician.
On June 23, 1977, plaintiff saw Dr. John E. Lindner, a general practitioner, for injuries sustained in the June 9 fall. Her complaints were of neck, back and left leg pain. Dr. Lindner’s diagnosis was muscular, skeletal sprain, lumbar sprain and contusion of the left leg. He prescribed conservative treatment, including ultrasound therapy, pain pills and muscle relaxants. Plaintiff was seen again by Dr. Lindner on eight occasions between June 30 and August 16. Her pain persisted and her treatment continued during that time.
Dr. Lindner referred plaintiff to Dr. Ralph A. Gessner, an orthopedist, who saw her initially on June 29,1977. Dr. Gessner’s examination indicated soft tissue injury without evidence of fracture or dislocation. This doctor was of the opinion that plaintiff had sustained an acute strain of the neck and lumbar spine. On an August 12, 1977 visit, he found spasm of the lumbar musculature and advised plaintiff to continue diathermy and medication prescribed by Dr. Lindner.
After a scheduled visit with Dr. Lindner on the morning of August 16, 1977, the automobile accident occurred. Plaintiff was taken to Mercy Hospital where she was seen by Dr. Gessner. No fracture or dislocation was found at that time. Plaintiff remained in the hospital for two days on this occasion.
Upon readmission on August 18, 1977 for a female disorder, plaintiff was examined by Dr. Raeburn C. Llewellyn, a neuro-sur-geon, at the request of Dr. Lindner. Plaintiff’s complaints were of pain in the neck, low back area and both arms and legs. Again spasms but not fractures were found in the neck and low back areas. Conservative therapy was prescribed.
After release from the hospital on August 23, 1977, plaintiff was seen on August 30, and September 2 by Dr. Gessner. He found tenderness and spasm in the neck and lumbar areas and restricted motion. He also conducted a pinprick test that was suggestive of nerve root involvement or, some nerve disturbance. His findings indicated the possibility of a ruptured disc. Plaintiff *268 was admitted to the hospital on September 13, 1977. A myelogram on September 20 was normal without evidence of pathology.
After continued visits to Dr. Lindner and Dr. Gessner,[2] plaintiff was examined again by Dr. Llewellyn on November 7,1977. Dr. Llewellyn felt her complaints could be related to a sprain and not associated with a disc rupture. Again conservative treatment was prescribed. Dr. Lindner admitted her to the hospital again on November 16, 1977 with continued complaints of pain.
An “EMG” test administered during the November hospitalization was normal. Plaintiff also underwent a discogram administered by Dr. David M. Jarrott, a neu-ro-surgeon. Dr. Jarrott indicated that the L6/S2 disc was injured or symptomatic. Dr. Gessner testified that the discogram was “equivocal” and that plaintiff should be followed on a conservative basis before surgery was performed. Dr. Llewellyn, who again examined plaintiff after the disco-grams were performed, encouraged her to continue non-operative treatment in late September, 1977. Dr. Lindner felt that the discogram was questionable instead of negative and felt that plaintiff had a ruptured disc.
Plaintiff was again admitted to the hospital on February 6, 1978, with cervical and lumbar strain and a possible ruptured disc. Plaintiff was treated conservatively and was discharged on February 15. She continued under the care of Dr. Lindner from February until July, 1978.
After no marked improvement, plaintiff was admitted to Tulane Medical Center on July 5, 1978 complaining of back and bilateral leg pain with continuing neck, shoulder and arm discomfort. X-rays were normal and plaintiff underwent therapy. While hospitalized on July 7, plaintiff fell from a sitting position striking her head and face. Dr. Llewellyn was of the opinion that the fall did not aggravate the back problem. Plaintiff’s diagnosis on admission to Tulane was chronic lumbar disc syndrome and cervical spine strain. This diagnosis remained the same when she was discharged seven days later.
On July 18, 1978, plaintiff saw Dr. Kenneth E. Vogel, a neuro-surgeon, on referral from Dr. Lindner. Dr. Vogel’s examination of her low back region revealed a moderate degree of limitation of motion, muscle spasms and tenderness. This physician diagnosed plaintiff’s condition as chronic cervical strain and subcapsular herniated lumbar disc.
Plaintiff was re-admitted to the hospital on September 10, 1978 and a discogram showed herniation at the L5/L6 level. Plaintiff then underwent a lumbar laminec-tomy. After surgery, her condition improved somewhat but at the time of trial she was experiencing recurring back pain.
Dr. Vogel was of the opinion that the medical probability was that the automobile accident and not the earlier fall by plaintiff at work, had caused the herniated disc. He stated that although plaintiff had low back and neck pain pre-existing the automobile accident, the injury in all probability became a “bonafide herniated disc” at the time of the accident. According to this expert, plaintiff’s negative myelogram in September, 1977 did not rule out a ruptured disc. He indicated that the post-automobile accident evidence of nerve root involvement indicated causation between the herniated disc and the car accident.
Dr. Llewellyn, the treating neuro-sur-geon, first saw plaintiff on August 18,1977. He stated that, in his opinion, plaintiff had a “disc problem” from the first time he saw her. He felt her problem has been at the L5/L6 disc and the post-operative and surgical findings were consistent with the dis-cogram result found in November, 1977. Dr. Llewellyn testified that a disc rupture can be relatively mild and not immediately detectable before gradually worsening and resulting into a “full blown disc” problem.
Dr. Lindner, also was of the opinion that plaintiff suffered a ruptured disc which was related to the automobile accident. He felt *269 that plaintiff’s condition had worsened from the time of the accident until surgery. He indicated that if plaintiff had not been in the automobile accident she probably would have recovered from the back injury sustained in the earlier fall. There was no doubt in Dr. Lindner’s mind that the automobile accident aggravated the pre-existing back condition.
Dr. Gessner also stated that although he did not clinically find suggestions of a ruptured disc, plaintiff’s subjective complaints were indicative of a rupture. He testified that plaintiff’s right leg pain after the automobile accident would suggest that it was a result of that accident, which aggravated the injury sustained in the earlier work-connected fall. He could not say however, whether the earlier fall or the automobile accident, was more responsible for plaintiff’s problem.
The jury also had the benefit of the testimony of Dr. Richard W. Levy, a neuro-sur-geon, who examined plaintiff on June 13, 1978 at the request of defendants. Dr. Levy testified that the examination was “totally normal” except for tenderness in the lower neck and left lower lumbar region. He found no evidence of a ruptured disc at that time. This physician was of the opinion that plaintiff’s fall on July 7, 1978 during hospitalization was the proximate cause of the ruptured disc found in September, 1978 absent any other known trauma in addition to that.
Dr. James T. Williams, an orthopedic surgeon, also examined plaintiff on February 1, 1978, at the request of the defense attorney. He found no evidence of a ruptured disc on that date and felt that plaintiff had objectively recovered from the effects of any prior injuries.
Our consideration of the medical evidence leads to a conclusion that plaintiff established causation between the automobile accident, the disc injury and the surgery. Accordingly, we find no error.
QUANTUM
The $75,000.00 “lump sum” award was subject to a credit in the sum of $8,502.12 owed to plaintiff’s subrogated insurer.[3] Plaintiff’s special damages in hospital costs, physicians fees and a towing charge amounted to $21,117.83. According to plaintiff the $75,000.00 award represents only $45,380.04 in general damages, an amount she contends “grossly inadequate” and an abuse of the jury’s discretion. We disagree.
Although plaintiff testified at length concerning her pain and suffering and her inability to work for a sustained period since the accident,[4] Dr. Vogel testified that plaintiff could probably “handle” some typing and filing job. This physician testified that even though statistically 10 or 20% of plaintiff’s previous back pain will persist, he would encourage her to try work recognizing that she may have some difficulty and pain. She should avoid work requiring her to lift, pull or push weights in excess of 30 pounds. The doctor indicated that he did not advise plaintiff she could not work.
As proof of loss of earning capacity, plaintiff’s actuary testified concerning her loss of future earnings based on assumed decreases in monthly income.[5] Viewing *270 this evidence in connection with Dr. Vogel’s testimony concerning plaintiff’s ability to work, together with the other evidence, we cannot say the amount awarded by the jury is an abuse of discretion. See Reck v. Stevens, 373 So.2d 498 (La.1979); CoCo v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
Having so concluded, we affirm the judgment.
AFFIRMED.

. The inconsistencies relate to the sequence in the signal light changes at the intersection; whether the Gonzalez vehicle stopped before entering the intersection; and, the time that a witness learned of the accident. The jury was apparently aware of these discrepancies in the testimony and awarded a judgment to plaintiff.

. Plaintiff saw Dr. Lindner on October 6, November 2, and November 7, 1977 on continued complaints of back and leg pain. She saw Dr. Gessner on October 11, 1977.

. Trinity Universal Insurance Company paid plaintiff $3,502.13 for property damage and $5,000.00 under the medical payments provisions of her policy.

. Plaintiff did not work after her discharge from Union Carbide (prior to the automobile accident) until February, 1979, post-operation, when she attempted to work as a bank teller. She left this job after a month and a half because of medical problems.
In April, 1979, plaintiff worked for one or two months as a nurse assistant for a physician, but was terminated because of absenteeism caused by back problems. Plaintiff also worked at Ochsner Clinic as a special procedure technician for about 3 months but left that job because it involved lifting and standing.
At the time of trial, plaintiff was on sick leave from her current job as an insurance clerk and testified that whether she returned to work after trial depended on medical advice.

.Plaintiff was twenty-four years old at the time of the accident and twenty-seven years old at date of trial. Based on her calculated work life expectancy of 343/io years, plaintiffs actuary projected a decrease in her earning capad *270 ty of $145,830.00, assuming a $500.00 per month decrease. He testified her loss of future earnings would be $87,497.00, assuming a $300.00 per month decrease; and $29,166.00, assuming a $100.00 per month decrease in earning capacity.